**IN THE COURT OF APPEALS OF IOWA**

No. 23-1481
Filed July 24, 2024

**IN THE MATTER OF THE GUARDIANSHIP OF K.E., a/k/a A.E.,**

**S.C., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Poweshiek County, Patrick McAvan,

Judge.


        A mother appeals a district court order establishing a guardianship for her

minor child.  **AFFIRMED.**


        Denise M. Gonyea of McKelvie Law Office, Grinnell, for appellant mother.

        Katelyn Kurt of Whitfield & Eddy, P.L.C., Des Moines, for appellee.

        Elizabeth S. Blough of Cashatt Warren Family Law, P.C., Des Moines,

guardian ad litem for minor child.


        Considered by Badding, P.J., Langholz, J., and Bower, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**BADDING, Presiding Judge.**

The juvenile court established a guardianship under Iowa Code section 232D.204(2) (2023) for a transgender youth with dysregulated mood disorder and suicidal ideations. The court appointed Elliot and Jessica—the parents of the child's best friend—as the child's guardians. The child's father, Jacob, consented to the guardianship; the child's mother, Savannah, did not.

At the guardianship hearing, the mother testified: "I wish we could find [the child] somewhere else to live." Yet on appeal, she claims the juvenile court erred in finding the guardianship was "the answer to her wish." Because there is clear and convincing evidence that the mother was not willing or able to exercise the powers the court granted to the guardians and the guardianship is in the child's best interest, we affirm upon our de novo review of the record.

## I.     Background Facts and Proceedings

In May 2023, Elliot and Jessica petitioned to be appointed guardians of K.E.,[1] born in 2008. K.E.'s parents are Jacob and Savannah. They separated when K.E. was two or three years old. From then until about two years before the petition was filed, K.E. lived with Savannah during the week and with Jacob on the weekends. But then one night after K.E. and Savannah argued, Jacob testified that Savannah "came to my house probably about 2:00 or 3:00 in the morning and just kind of dropped him off and said, 'He's your problem now.'" Savannah had

---

[1] These are the initials for the child's legal name, although the child goes by a different name now. The child's preferred pronouns are he, him, and his, which is what the parties mostly used during the juvenile court proceedings.

limited contact with K.E. after that, texting Jacob at one point that the child was "mean, hateful, cruel, and just plain nasty. I am done."

Savannah testified that K.E. was diagnosed with dysregulated mood disorder at age eight, which she compared to "bipolarism in children." K.E. was hospitalized for a time and placed on medication. While K.E. "always had . . . problems controlling [his] emotions," according to Savannah, they had a good relationship until Savannah suffered a traumatic brain injury from a car accident in October 2020. After that, Savannah testified their relationship changed because K.E. was mad that Savannah asked him "to help around the house more and do chores more." Jacob, however, said K.E.'s relationship with Savannah was never good. Savannah testified that she often called the police or Jacob for assistance with K.E. because the child was "beating me, hurting me, and everything."

Jacob enrolled K.E. in a different school after the child came to live with him. The school's principal testified that although K.E. was "a very bright individual, very inquisitive, very open-minded," he was also "a very troubled student in terms of making friends, fitting in." When K.E. first arrived at the school, the child was reclusive and "kind of ostracized" by the other students. K.E. was often "not wanting to go to class, hiding out in the bathroom, always wanting to wear their hood in school." He had poor attendance and grades, with a 0.53 grade point average his freshman year of high school. K.E. struggled with self-harm and threatened to commit suicide on more than one occasion.

Things got better for K.E. after he became friends with O.Z., one of Elliot and Jessica's children. The two children met in 2021 while they were still in middle

school. K.E. started going to Elliot and Jessica's house on Friday evenings for dinner. Soon, according to Elliot, "he was coming over every single day," though aside from some sleepovers with O.Z., he would go back to Jacob's house at night. Jessica testified they started referring to K.E. as their "bonus kid":

> [W]e felt like he was part of our family when he was spending regular time with us at our home in Iowa. He fits right in with the other kids, shares interests, and enjoys spending time with us, so we started including him in family activities like going to the movies or going out to meals. He was such a pleasure to have with us that we continued to include him in our activities.

K.E.'s principal testified that as the child started spending more time with Elliot and Jessica's family, he started improving at school: "[H]e had probably more of a little bit of anchor with [O.Z.'s] family, a little bit more stability." K.E.'s father noticed an improvement too, describing Elliot and Jessica as "just really good people, and they have already done a lot to help [K.E.] grow as a person. . . . I noticed just a night and day difference with [K.E.'s] attitude. He's much more polite, very calm."

In the spring of 2023, Elliot and Jessica decided to move their family to Connecticut where Elliot grew up. Jessica is an obstetrician gynecologist and accepted a position at a local hospital. When they told K.E. that they were moving, the child told them that he wanted to go with them. So Elliot and Jessica approached Jacob with the idea. He supported it because K.E. had "been struggling in his current living environment." Jacob was "afraid that if K.E. doesn't get out of here and go, that some day I'm going to come home and find him dead." But Savannah was opposed. She told Elliot that K.E. "is violent and destructive and she didn't want to be responsible if he damaged our property or hurt us. She

also said that as a mother, you know, if something were to happen to him, that she wanted to be able to be here." Elliot and Jessica intended to fly K.E. home for the holidays or other visits at their expense, and they offered to fly Savannah out if something were to happen with K.E. But Savannah was convinced they were "going to alienate me from my child."

Elliot and Jessica moved to Connecticut with their three children in June, while their guardianship petition was pending. K.E. came to visit them twice, staying for two weeks each time. Elliot testified that K.E. was a different person in Connecticut:

> I don't think that I ever saw his face in Iowa because he had his hair swept over his eyes because he was hiding his face. . . . He's cut his hair now in the front so we can see his face, because he feels comfortable and happy. He told me that in Iowa he would spend most of the time daydreaming about a better life because he was just so upset and he didn't want to go outside, but since he's come here, he said he doesn't have time or really any need to daydream because he's just enjoying his life so much.

The family planned to enroll K.E. in the same high school their children were going to attend. That school had counselors who were "trained in helping LGBTQ+ kids," with proactive policies to help transgender children. K.E.'s principal in Iowa testified that the child would "absolutely" benefit from those resources, which exceeded what his school could offer. He explained that because of K.E.'s failing grades freshman year, the child would have to complete an online credit recovery program. But the principal said the success rate for that program was not good. If their petition was granted, Elliot and Jessica planned to get K.E. "tested for decoding and comprehension issues." As a former high school teacher turned

stay-at-home father,[2] Elliot planned "to work very, very closely with [K.E.] to get him back on track," in addition to seeking out peer tutoring at the high school. Jessica hoped that "the stability of having a safe place to live and be accepted and friends will allow [K.E.] to put energy into his studies, and that will improve his attendance." They also intended to get K.E. in therapy and work with him at home on self-regulation and breathing techniques to help with his anxiety.

In contrast, Savannah had no plan for K.E. if he stayed in Iowa, testifying: "I don't know where to put [him]." She believed that K.E. needed to be admitted to "a counseling facility," like Orchard Place, "to get deep counseling and get people to help teach [him] things and kind of discover and find" himself. When K.E. was done at the facility, Savannah testified he could live with her, explaining: "I do want [K.E.] living with me. I just don't want to be abused in my home, and I don't want to put my other children at risk." Alternatively, Savannah suggested that K.E. could enroll in a Job Corps program in Kansas City when he was sixteen.

The court visitor authored a report after speaking to K.E., his parents, Elliot, Jessica, and K.E.'s high school principal. The visitor detailed her conversation with K.E., who

> expressed his anxiety around the bullying he experiences in Iowa, and his difficulty to participate in school with a looming sense that he is being judged by both students and faculty members. He shared that he feels safe with his father, but he does not have the resources to feel safe in the community.

But in Connecticut, K.E. told the visitor that he "was excited to be in a place where there were more people like him." He was looking forward to attending the high

---

[2] Elliot has a bachelor's degree in philosophy and psychology from Yale University, and a master's in journalism from the University of California, Berkeley.

school there, "specifically because of the opportunities in biology, home economics, theater, and other extracurricular activities." K.E. also "spoke very highly of the counseling opportunities at the high school," which Jacob agreed were greater than those offered at K.E.'s school in Iowa. In all, K.E. told the visitor that he was "very optimistic about this new school and the chance to make new friends." The visitor recommended granting Elliot and Jessica's guardianship petition, noting that while Savannah offered alternatives to the guardianship, none were appropriate "given [K.E.'s] circumstances. It is clear she does not want [K.E.] to go to Connecticut, and she does not necessarily want [K.E.] to continue living with his father; however, she also does not want [K.E.] to live with her."

After a hearing on the petition in August, the juvenile court appointed Elliot and Jessica as K.E.'s guardians under Iowa Code section 232D.204(2), ruling:

> The evidence is both clear and convincing that Savannah is unable to exercise the power the court will grant a guardian if the court appoints a guardian. Savannah has taken a hands off approach to parenting [K.E.] in the past two years. . . .
> . . . . Savannah repeatedly stated during the hearing that she does not know what to do to parent [K.E.], to access additional services, or to deal with the violent behaviors. Savannah acknowledges she is unable to have [K.E.] safely in her home at this time. Savannah is fearful of [K.E.] She does not like being alone with [K.E.] She is willing to allow him to go somewhere as long as it is within driving distance so she can visit, testifying, "I wish there was someplace else for [him] to go."
> This guardianship petition is the answer to her wish. It is somewhere where [K.E.] can go to get services that directly address his needs. It is safe, and with people with whom he is comfortable. The evidence is clear and convincing that appointment of a guardian for [K.E] is in his best interest.

Savannah appeals.

## II.    Standard of Review

"Our standard of review of the establishment of a guardianship of a minor is de novo."  *In re Guardianship of B.B.*, No. 21–0992, 2022 WL 523325, at *3 (Iowa Ct. App. Feb. 22, 2022).  "We give weight to the juvenile court's factual findings, but we are not bound by them."  *In re Guardianship of L.Y.*, 968 N.W.2d 882, 892 (Iowa 2022).

## III.    Analysis

Iowa Code section 232D.204(2) allows the juvenile court to appoint a guardian for a minor child without parental consent

> if the court finds by clear and convincing evidence all of the following:
> a. No parent having legal custody of the minor is willing or able to exercise the power the court will grant to the guardian if the court appoints a guardian.
> b. Appointment of a guardian for the minor is in the best interest of the minor.

Without expressly addressing these elements, Savannah claims the juvenile court erred in finding a guardianship was necessary because she "is clearly familiar with the child's behavior, personality, and mental health struggles" since K.E. lived with her for most of his life.  While she may be familiar with those issues, the evidence supported the court visitor's observation that Savannah

> has not taken any steps to address [K.E.'s] needs, make him feel safe, or provide him with a positive, nurturing environment.  This would suggest that Savannah is either incapable of or unwilling to minister to the best interests of the child.  Savannah's claims to have offered an opportunity to attend family therapy do not overcome the reality that nothing has been done to repair the relationship.  At best, an attitude of indifference has been shown to [K.E.] that has left him feeling unsupported and unappreciated by his mother. . . . Savannah noted that she is afraid of [K.E.], and [K.E.] is openly resisting contact with his mother.

Elliot and Jessica presented clear and convincing evidence that Savannah was not able or willing to provide K.E. with the most basic power granted to a guardian—providing the child with a permanent residence. *See* Iowa Code § 232D.401(3)(a). Consistent with her testimony at trial, Savannah told the child in a text message before the hearing that "I don't think you living here is a good idea unless we actually set up some sort of family counseling." But Savannah did not take any steps to set up that counseling, testifying that she removed the child from her medical insurance after the child went to live with Jacob, *see id.* § 232D.401(3)(b), and he would not cooperate with family counseling. She repeated that claim in a text message to the child, telling him: "Your dad really should set up a therapy appointment between the two of us instead of encouraging you to [h]ate me." In response, the child said: "We tried to, you got angry [when] the therapist said you needed help too . . . and threw a fit."

Jacob testified that in the two years since K.E. came to live with him, Savannah had not played an active role in his life. Although he told Savannah a few times about K.E.'s failing grades, Savannah claimed the first time she found out the child had a 0.53 grade point average was at the hearing. *See id.* § 232D.401(3)(c). Jacob also testified that almost every visit between K.E. and his mother ends with an argument "and the time gets cut short." Savannah seemed to agree, testifying K.E. is "constantly just angry" and "won't calm down at my house." Their most recent visit in May ended when K.E. dug his nails into his skin, scratched himself, and "started screaming and cussing" at her while they were discussing Connecticut. So Savannah testified that she "just stopped everything we were doing and took [him] home because I didn't know what else to do." This

was a common refrain for Savannah at trial, as the juvenile court found: "Savannah testified, 'I don't know what to do' on multiple occasions. She testified that she does not know why [K.E.] is so mean and does not know how to help him."

Savannah argues that a "parent should not be penalized for attempting to seek help for their child." That's true. *See In re Guardianship of Sams*, 256 N.W.2d 570, 573 (Iowa 1977) ("Our cases have emphasized that parents should be encouraged in time of need to look for help in caring for their children without risking loss of custody."). But Savannah didn't really seek help for K.E.—instead, she washed her hands of him, at least until the guardianship petition was filed. She was content until then to let Jacob provide K.E. with a home, attend to his daily care, arrange for his medical care, and manage his educational needs. *See B.B.*, 2022 WL 523325, at *4 (finding the parental preference did not apply when a father, by his inaction, "demonstrated a lack of consistent parental participation" in the child's life). Although Savannah did not want K.E. to move to Connecticut, she admitted, "I don't know where is a good place for my child to live." Yet she argues the "fact that [Elliot and Jessica] believe that they have more resources and a better plan for the youth does not remove the fact that the mother retains parental rights and the constitutional authority to make decisions for her child." *See L.Y.*, 968 N.W.2d at 895 ("In light of parents' fundamental liberty interests in the care, custody, and control of their children and the presumption that fit parents act in their children's best interests, we must give 'due regard for the superior rights of a fit, proper, and suitable parent' over all others." (citation omitted)).

"Though no longer explicit in the statute, the parental preference remains." *B.B.*, 2022 WL 523325, at *3 (citing *L.Y.*, 968 N.W.2d at 894). But a parent like

Savannah, who "has taken an extended holiday from the responsibilities of parenthood, may not take advantage of the parental preference for custody." *Id.* (cleaned up). While Savannah claims on appeal that she was "able and willing to exercise the powers" granted to Elliot and Jessica, clear and convincing evidence showed that was not the case.

We also agree with the juvenile court that appointing Elliot and Jessica as K.E.'s guardians is in his best interest, although Savannah does not challenge that conclusion on appeal. As Elliot testified at trial,

> I want to be [K.E.'s] guardian because I feel like if he were to go back to Iowa, he's at very high risk for suicide, and I think here he will have so much more chances. He's so much happier and it's a better environment for him, that I think he has a really good chance to succeed and hopefully go to college.

Jacob shared those same hopes for K.E., testifying that although his "stomach has been in knots" because he will miss K.E., "I don't want him to feel like there is no hope, and I think that's exactly what this kid needs, is some hope."

We agree and affirm the juvenile court.

**AFFIRMED.**